IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

MARY ANN BRODIE,

        Plaintiff,

vs.                                                                          No.  02cv0746  DJS

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL SECURITY,

        Defendant.

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Plaintiff's (Brodie's) Motion to Reverse and Remand
for a Rehearing [**Doc. No. 15**], filed October 2, 2003, and fully briefed on November 17, 2003.
The Commissioner of Social Security issued a final decision denying Brodie's claim for
supplemental security income benefits.  Having considered the arguments, pleadings,
administrative record, relevant law, and being otherwise fully informed, the Court finds the
motion to remand for a rehearing is well taken and will be GRANTED.

### I.  Factual and Procedural Background

Brodie, now forty-six years old, protectively filed her application for supplemental security
income benefits on September 2, 1999, alleging disability due to "rheumatic, pulmonary artery and
hypertensive heart disease, hypothyroidism, and diabetes mellitus."  Tr. 15.  Brodie has an eighth
grade education and no past relevant work.  On February 20, 2001, the Commissioner's
Administrative Law Judge (ALJ) denied benefits, finding that Brodie's impairments were severe
but did not meet or equal in severity any of the disorders described in the Listing of Impairments,

Subpart P, Appendix 1, Regulations No. 4.  Tr. 15.  Specifically, the ALJ reviewed Listings 4.02

(chronic heart failure); 4.03 (hypertensive cardiovascular disease), 4.05 (recurrent arrhythmias);

4.07(valvular heart disease); 9.03 (hyperparathyroidism); 9.08 (diabetes mellitus).  Tr. 16.  The

Court notes that Brodie suffered from hyperthyroidism at one time, not hyperparathyroidism.  The

ALJ further found Brodie retained the residual functional capacity (RFC) for a full range of light

work.  *Id*.  As to her credibility, the ALJ found her allegations regarding her limitations were not

totally credible.  Tr. 19.  On April 27, 2002, the Appeals Council denied Brodie's request for

review of the ALJ's decision.  Hence, the decision of the ALJ became the final decision of the

Commissioner for judicial review purposes.  Brodie seeks judicial review of the Commissioner's

final decision pursuant to 42 U.S.C. § 405(g).

## II.  Standard of Review

The standard of review in this Social Security appeal is whether the Commissioner's final

decision is supported by substantial evidence and whether he applied correct legal standards.

*Hamilton v. Secretary of Health and Human Services,* 961 F.2d 1495, 1497-98 (10th Cir. 1992).

Substantial evidence is more than a mere scintilla and is such relevant evidence as a reasonable

mind might accept as adequate to support a conclusion. *Glass v. Shalala*, 43 F.3d 1392, 1395

(10th Cir. 1994).  "Evidence is not substantial if it is overwhelmed by other evidence in the record

or constitutes mere conclusion."  *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992).

Moreover, "all of the ALJ's required findings must be supported by substantial evidence,"

*Haddock v. Apfel,* 196 F.3d 1084, 1088 (10th Cir. 1999), and all of the relevant medical evidence

of record must be considered in making those findings, *see Baker v. Bowen*, 886 F.2d 289, 291

(10th Cir. 1989).  "[I]n addition to discussing the evidence supporting his decision, the ALJ must

2

discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects." *Clifton v. Chater*, 79 F.3d 1007, 1010 (10th Cir. 1996).  Therefore, while the Court does not reweigh the evidence or try the issues de novo, *see Sisco v. United States Dep't of Health & Human Servs.*, 10 F.3d 739, 741 (10th Cir. 1993), the Court must meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings, in order to determine if the substantiality test has been met.  *See Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994).

### III.  Discussion

In order to qualify for disability insurance benefits or supplemental security income, a claimant must establish a severe physical or mental impairment expected to result in death or last for a continuous period of twelve months which prevents the claimant from engaging in substantial gainful activity.  *Thompson v. Sullivan*, 987 F.2d 1482, 1486 (10th Cir. 1993)(citing 42 U.S.C. §423(d)(1)(A)).  The regulations of the Social Security Administration require the Commissioner to evaluate five factors in a specific sequence in analyzing disability applications. 20 C.F.R. § 404.1520 (a-f).  The sequential evaluation process ends if, at any step, the Commissioner finds the claimant is not disabled.  *Thompson*, 987 F.2d at 1487.

At the first four levels of the sequential evaluation process, the claimant must show she is not engaged in substantial gainful employment, she has an impairment or combination of impairments severe enough to limit her ability to do basic work activities, and her impairment meets or equals one of the presumptively disabling impairments listed in the regulations under 20 C.F.R. Part 404, Subpt. P, App. 1, or she is unable to perform work she had done in the past. 20 C.F.R. §§ 404.1520 and 416.920.  At the fifth step of the evaluation, the burden of proof shifts to

the Commissioner to show the claimant is able to perform other substantial gainful activity

considering her residual functional capacity, age, education, and prior work experience. *Id.*

In support of her motion to reverse, Brodie makes the following arguments: (1) the ALJ

erred in relying conclusively on the Medical-Vocational Guidelines; and (2) the ALJ failed to give

her treating physician's opinion the proper weight.

## A.  Medical-Vocational Guidelines

In his decision, the ALJ found Brodie retained the residual functional capacity (RFC) for a

full range of light work.  Tr.  16.  Brodie contends the ALJ failed to properly consider her

nonexertional impairments of dizziness, shortness of breath and fatigue.  According to Brodie,

these nonexertional impairments are caused by her mitral valve disease and pulmonary

hypertension and significantly erode the underlying job base.  Hence, Brodie argues the ALJ

should have consulted with a vocational expert.

The grids represent the Commissioner's administrative notice of the jobs that exist in the

national economy at the various functional levels (i.e. sedentary, light, medium, heavy, and very

heavy).  *See Channel v. Heckler,* 747 F.2d 577, 579 (10th Cir. 1984).  If the ALJ's findings of

fact regarding a particular individual's age, education, training, and residual functional capacity

(RFC) all coincide with the criteria of a particular rule on these grids, the ALJ may conclude that

jobs suitable for the claimant exist in the national economy and that the claimant therefore is not

disabled.  *Id.*

Because the grids classify RFC based only on exertional or physical strength limitations,

they may not be fully applicable to claimants with nonexertional impairments.  See 20 C.F.R.

416.967; *Channel v. Heckler,* 747 F.2d at 580-81.  Nonexertional impairments are medically

4

determinable impairments that do not directly limit physical exertion but may reduce an

individual's ability to perform gainful work nonetheless. *Id.* at 580. Dizziness, shortness of

breath, and fatigue are considered nonexertional impairments. *See Christian v. Apfel,* No. 98-

6367, 1999 WL 559921, at **2 (10th Cir. Aug. 2, 1999).

      If nonexertional impairments narrow the range of possible work the claimant can perform,

the ALJ may only use the grids as a "framework" for determining whether, in light of all

claimant's impairments, she has meaningful employment opportunity within the national economy.

20 C.F.R. pt. 404, subpt. P, App.2, 200 (e) (2). In such cases, the ALJ must also produce a

vocational expert to testify whether specific jobs appropriate to claimant's limitations exist in the

national economy. *Channel*, 747 F.2d at 581.

      In this case, Brodie reported experiencing dizziness since 1991 due to her heart condition.

Tr. 74, 82. Brodie also reported suffering from fatigue and having to rest fifteen to thirty minutes

after any activity. Tr. 76. Brodie reported mopping, sweeping, bringing in wood, taking out

trash, and any walking or lifting caused her shortness of breath. Tr. 94. Brodie also complained

she could no longer clean her house without stopping to rest because of the fatigue and shortness

of breath. *Id.* Brodie stressed that she required help from her daughter or husband to clean her

house and do the laundry. Tr. 95. And, although Brodie reported she enjoyed quilting, she also

reported engaging in this activity only "about 10 to 15 mins, twice a week." Tr. 96. Brodie's

sister submitted a statement on Brodie's behalf, corroborating Brodie's testimony regarding her

exertional and nonexertional impairments. Tr. 103.

Brodie's medical records support her testimony regarding her nonexertional impairments. Dr. Richtsmeier is a cardiologist and Brodie's treating physician. The medical records indicate as follows:

On September 1, 1998, Dr. Richtsmeier evaluated Brodie. Tr. 206. Dr. Reichtsmeier diagnosed Brodie with (1) rheumatic mitral stenosis and regurgitation; and (2) secondary pulmonary hypertension. Dr. Richtsmeier also noted the echocardiography results.

On October 15, 1998, Brodie saw Dr. Richtsmeier for a follow-up visit. Tr. 205. Brodie had no complaints.

On December 24, 1998, Brodie went to the emergency room, complaining of "a fast heart beat." Tr. 169. The attending physician treated Brodie with Diltiazem (antihypertensive medication). The physician instructed Brodie to follow-up with Dr. Richtsmeier.

On March 2, 1999, Dr. Richtsmeier admitted Brodie to the Intensive Care Unit  for paroxysmal atrial fibrillation.[1] Dr. Richtsmeier noted in Brodie's History that she became somewhat more symptomatic during thyrotoxicosis in 1991, with the echocardiogram indicating a moderate mitral stenosis with pulmonary hypertension and tricuspid regurgitation. Tr. 117. Dr. Richtsmeier administered Diltiazem intravenous infusion to control heart rate and Procainamide (antiarrhythmic drug) intravenous infusion for electrocardioversion. Tr. 116. The record indicates Brodie was treated in the emergency room for paroxysmal atrial fibrillation on November 16, 1998. Tr. 137.

---

[1] Paroxysmal atrial fibrillation is an intermittent rapid irregular atrial rhythm due to multiple reentrant wavelets. The symptoms of paroxysmal atrial fibrillation are often devastating because of the sporadic dramatic changes of heart rate and regularity. Medical prophylaxis of attacks has proved disappointing. *The Merck Manual* 1724 (17th ed. 1999).

On March 3, 1999, Brodie had an echocardiogram performed by the Cardiovascular

Ultrasound Laboratory.  Tr. 216.  The echocardiogram report indicated Brodie suffered from

moderate to severe mitral regurgitation, mild aortic regurgitation, and mild to moderate tricuspid

regurgitation.  The echocardiogram conclusions were as follows:

(1)     Left Ventricular findings including:
        a.      Borderline left ventricular hypertrophy.
        b.      Normal chamber dimensions and wall motion.
(2)     Left atrial enlargement, moderate.
(3)     Mitral valve abnormalities including:
        a.      Typical rheumatic deformity with moderate increase in mitral valve thickness,
                decreased excursion and increased subvalvar thickening.  Mitral orifice is
                eccentric.
        b.      Moderate mitral stenosis with mitral valve area by two techniques, 1.7 cm2.  A
                mean mitral gradient is 11.  Moderate mitral regurgitation.
(4)     Mild rheumatic aortic stenosis and aortic insufficiency.
(5)     Normal right ventricular and right atrial dimensions.
(6)     Mild-moderate tricuspid regurgitation.
(7)     Pulmonary artery systolic pressure is estimated to be 55-60 mm mercury.
(8)     Central venous pressure is estimated to be 10-15 mm mercury.

Tr. 217.  Dr. Richtsmeier opined the onset of Brodie's atrial fibrillation was associated with the

combined mitral stenosis and mitral regurgitation.  *Id.*

On May 8, 1999, Brodie went to the emergency room with complaints of "heart beating

too fast at bedtime."  Tr. 159.  The attending physician diagnosed Brodie with atrial fibrillation,

treated her with Diltiazem and Digoxin and instructed her to keep a May 11, 1999 appointment

with Dr. Richtsmeier.

On May 11, 1999, Brodie kept her appointment with Dr. Richtsmeier.  Tr. 200.  Brodie

reported three episodes of paroxysmal atrial fibrillation.  Dr. Richtsmeier noted he discussed the

case with Dr. Gray.  Dr. Richtsmeier noted it was probably best for Brodie to have catherization

and mitral valve repair or replacement.  Dr. Richtsmeier referred Brodie to Dr. Gray.

7

On May 26, 1999, Dr. Gray evaluated Brodie at the request of Dr. Richtsmeier.  Tr. 109. Dr. Richtsmeier referred Brodie to Dr. Gray because of "several recurrences of paroxysmal atrial fibrillation requiring cardioversion (pharmacological)" and "subtle, but real reduction in exercise capacity related to leg pain, and dyspnea (shortness of breath) on exertion."  *Id.*  Dr. Gray determined Brodie should be admitted for right and left heart catherization and coronary cineangiography.  Tr. 110.  Dr. Gray admitted Brodie to Presbyterian Hospital on June 14, 1999. Dr. Gray discharged Brodie on June 15, 1999.

On June 15, 1999, Dr. William A. Gray, completed a Discharge Summary.  Tr. 105-106. In this summary, Dr. Gray noted, "The patient was admitted for a diagnostic right and left heart catheterization in light of recent echocardiograpy which demonstrated a possible severe mitral regurgitation, and breathlessness on clinical assessment, mostly related to dyspnea on exertion." Tr. 106.  Dr. Gray diagnosed Brodie with pulmonary hypertension, mild aortic stenosis and insufficiency, Diabetes Mellitus Type II, and Paroxysmal atrial fibrillation.  Tr. 105.

On June 29, 1999, Brodie returned to the emergency room with complaints of "rapid heart beat."  Tr. 153.  The attending physician diagnosed Brodie with atrial fibrillation and treated her with Diltiazem and Digoxin.  *Id.*

On July 6, 1999, Brodie saw Dr. Richtsmeier for a follow-up visit.  Tr. 198.  Brodie reported no problems.  Dr. Richtsmeier noted he would refer Brodie to a Dr. Badesh at the University of Colorado.  *Id.*

On July 11, 1999, Brodie went to the emergency room with complaints of paroxysmal atrial fibrillation.  Tr. 147.  The attending physician treated Brodie with Diltiazem and Digoxin. *Id.*

On August 17, 1999, Brodie saw Dr. Richtsmeier for a follow-up visit.  Tr. 197.  Brodie had no complaints at this time but reported two episodes of palpitations.  However, she reported she was "still active around [the] house."  *Id.*  Dr. Richtsmeier referred her to the University of Colorado for an evaluation.

On October 31, 1999, Brodie went to the emergency room with complaints of paroxysmal atrial fibrillation.  Tr. 141.  The attending physician treated Brodie with Diltiazem and Digoxin.  Tr. 142.  Brodie was discharged and instructed to keep her appointment with Dr. Richtsmeier on November 18, 1999.  Tr. 141.

On December 14, 1999, Brodie saw Dr. Richtsmeier for a follow-up visit.  Tr. 195.  Brodie informed Dr. Richtsmeier that she had been evaluated in Colorado for her pulmonary hypertension and was "no better."  *Id.*  Brodie also reported she had been treated for paroxysmal atrial fibrillation in the emergency room the previous week.  At this time, Dr. Richtsmeier noted, "can do house work ok."  *Id.*  Brodie's diabetes also was poorly controlled at this time.

On February 20, 2000, Brodie went to the emergency room with complaints of paroxysmal atrial fibrillation.  Tr. 129.  The attending physician treated Brodie with Diltiazem and Digoxin.  *Id.*  The physician instructed her to see her cardiologist the following Tuesday.  Tr. 130.

On February 24, 2000, Brodie saw Dr. Richtsmeier for a follow-up visit.  Tr. 192.  Dr. Richtsmeier noted Brodie was doing well.  Dr. Richtsmeier listed Brodie's diagnoses as (1) rheumatic mitral stenosis/regurgitation; (2) recurrent paroxysmal atrial fibrillation; (3) Diabetes Mellitus Type II; and (4) anemia.  *Id.*  Brodie informed Dr. Richtsmeier that she had been to the emergency room on February 20, 2000, and the attending physician had increased the dosage of the Diltiazem and the Digoxin.

Dr. Richtsmeier submitted an undated "To Whom It May Concern" letter, opining Brodie was disabled. Tr. 244-245. Dr. Richtsmeier noted he had treated Brodie for over three years and saw her regularly in the Cardiology Clinic. Dr. Richtsmeier is the Chief Cardiologist in the Department of Internal Medicine. *Id.* Dr. Richtsmeier noted "she is currently on Volume 3 of her GIMC (Gallup Indian Medical Center) medical record. Dr. Richtsmeier explained the course of Brodie's heart problem since childhood. Dr. Richtsmeier noted:

> Mary Ann had Acute Rheumatic Fever as a child and developed adult Rheumatic heart disease during her second pregnancy. By 1991 she had <u>severe</u> rheumatic mitral valve disease and secondary pulmonary hypertension and underwent mitral valve balloon valvuloplasty in Albuquerque in 1995 with apparent good valvular result but incomplete resolution of her pulmonary hypertension. In 1998 she began to have recurrent paroxysms of atrial fibrillation. <u>Initially these were controlled by medications but she developed chronic atrial fibrillation.</u> The combination of mitral valve disease and atrial fibrillation is difficult to treat, is usually not normalized by treatment, and is so present in Ms. Brodie. This significantly limits her ability to exercise.
>
> The recurrent PAF and <u>easy fatigability</u> lead to repeat cardiac catheterization which demonstrated increasing pulmonary hypertension but only moderate mitral stenosis, and was not offered mitral valve surgery. She was referred to the University of Colorado for workup of her pulmonary hypertension which demonstrated no clearly reversible cause. She received sleep study evaluation for nocturnal obstructive sleep apnea at RMCH at the suggestion of Dr. Badesh (U of C) and was found to have nocturnal hypoxia and remains on supplemental nocturnal oxygen. Pulmonary Hypertension adds an addition[al] burden on her ability to exercise, <u>causing shortness of breath at low levels of exertion.</u>

Tr. 244 (emphasis added). Dr. Richtsmeier opined Brodie was 70% disabled due to her rheumatic, pulmonary artery and hypertensive heart disease. Tr. 245. Dr. Richtsmeier also opined "there was no likelihood on recovering from these disabilities in the near future." *Id.*

In his decision, the ALJ found Brodie's atrial fibrillation was only intermittent in nature. Tr. 16. This is contrary to Dr. Richtsmeier's diagnosis of <u>chronic</u> atrial fibrillation. Tr. 244. There also is objective medical evidence supporting Brodie's allegations of fatigue and shortness of breath. These are nonexertional impairments that would significantly affect Brodie's ability to

perform "a full range of light work" and preclude the ALJ from conclusively relying on the grids. On remand, the ALJ should consult a vocational expert to determine whether Brodie retains the RFC to perform "a full range of light work" and reconsider his RFC if necessary.  The ALJ also should request Brodie's medical records from the Gallup Indian Medical Center since Dr. Richtsmeier indicated in his letter that there currently are three volumes available.  The ALJ noted "that the medical record [was] very sparse in this case."  Tr. 16.

## B.  Treating Physician's Opinion

Generally, the ALJ must "give controlling weight to a treating physician's well-supported opinion, so long as it is not inconsistent with other substantial evidence in the record."  *Drapeau v. Massanari*, 255 F.3d 1211, 1213 (10th Cir. 2001).  A treating physician's opinion is considered in relation to factors such as its consistency with other evidence, the length and nature of the treatment relationship, the frequency of examination, and the extent to which the opinion is supported by objective medical evidence.  20 C.F.R. § 416.927(d) (1)-(6).  Additionally, the opinions of specialists related to their area of specialty are entitled to more weight than that of a physician who is not a specialist in the area involved.  See 20 C.F.R. § 416.927(d)(5).

A treating physician's opinion that a claimant is totally disabled is not dispositive "because final responsibility for determining the ultimate issue of disability is reserved to the [Commissioner]."  *Castellano v. Secretary of Health & Human Servs.*, 26 F.3d 1027, 1029 (10th Cir. 1994).  However, unless good cause is shown to the contrary, the Commissioner must give substantial weight to the testimony of the claimant's treating physician.  If the opinion of the claimant's physician is to be disregarded, specific legitimate reasons for this action must be set forth.  *Byron v. Heckler*, 742 F.2d 1232, 1235 (10th Cir. 1984).  An ALJ may not substitute his

11

own opinion for a medical opinion, see *Sisco v. United States Dep't of Health & Human Servs.*,

10 F.3d 739, 744 (10th Cir. 1993), nonetheless, if the physician's opinion is "brief, conclusory and

unsupported by medical evidence," that opinion may be rejected.  *Bernal v. Bowen*, 851 F.2d 297,

301 (10th Cir. 1988).

> In this case, the ALJ found:

> I have considered the undated report by Dr. Thomas Richtsmeier.  Dr. Richtsmeier noted that the claimant underwent a balloon valvuloplasty in 1995 with good valvular result.  However, there was incomplete resolution of her pulmonary hypertension.  In 1998, she began to have recurrent paroxysms of atrial fibrillation. The combination of mitral valve disease and atrial fibrillation is difficult to treat and is usually not normalized by treatment.  This condition significantly limits her ability to exercise.  However, she had only moderate mitral stenosis and she was not offered mitral valve surgery.  She was also found to have nocturnal hypoxia and remained on supplemental nocturnal oxygen.  Pulmonary hypertension added to the burden on her ability to exercise, causing shortness of breath at low levels of exertion.  The claimant also had two metabolic problems consisting of hypothyroidism and diabetes mellitus.

> Dr. Richtsmeier found the claimant to be 70 percent disabled by her rheumatic, pulmonary artery, and hypertensive heart disease, 10 percent disabled by her endocrine problems, and 10 percent by her treatments (Exhibit 10-F).  However, I give Dr. Richtsmeier's conclusion no significant weight, since it is brief, conclusory, and unsupported by objective medical evidence (Exhibit 10-F).

Tr. 17.  The ALJ rejected Dr. Richtsmeier's opinion, finding it "brief, conclusory, and

unsupported by objective medical evidence."  *Id.*  The ALJ then relied on the RFC assessment

submitted by Dr. Donald Stewart, an agency nonexamining consultant, and found Brodie retained

the ability to perform a full range of light work.  Tr. 18.  However, Dr. Richtsmeier's opinion was

entitled to greater weight than that of Dr. Stewart's.  *See Broadbent v. Harris*, 698 F.2d 407, 412

(10th Cir. 1983)(opinions of physicians who have treated a patient over a period of time or who

are consulted for purposes of treatment are given greater weight than are reports of physicians

employed and paid by the government for the purpose of defending against a disability claim).  In

this case, Dr. Richtsmeier is a specialist.  Moreover, his opinion is <u>not</u> brief, conclusory or

12

unsupported by the objective medical evidence.  On remand, the ALJ shall give Dr.  Richtsmeier's

opinion the proper weight of a specialist and treating physician and have Dr. Richtsmeier

complete an RFC assessment form (physical).

**Conclusion**

      The Court will remand this case to allow the ALJ to consult with a vocational expert and

determine whether Brodie retains the RFC to perform a full range of light work.  The ALJ shall

also reconsider Dr. Richtsmeier's opinion as a specialist and treating physician and have Dr.

Richtsmeier complete a physical RFC assessment form.  Finally, the ALJ should request Brodie's

records from the Gallup Indian Medical Center.  However, the Court expresses no opinion as to

the extent of Brodie's impairments, or whether she is or is not disabled within the meaning of the

Social Security Act.  The Court does not require any result.  This remand simply assures that the

ALJ applies the correct legal standards in reaching a decision based on the facts of the case.

      A judgment in accordance with this Memorandum Opinion and Order will be entered.


_____
**DON J. SVET**
**UNITED STATES MAGISTRATE JUDGE**